THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION CINCINNATI

ALISON MCKINNON,

      Plaintiff,

      vs.

L-3 COMMUNICATIONS
CORPORATION, ET AL.,

      Defendants.

Case No.1:16-CV-00458-MRB

Judge Michael R Barrett

## ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendants L-3

Communications Corp. and L-3 Communications Cincinnati Electronics Corp. ("Motion for

Summary Judgment") (Doc. 28). This matter is fully briefed and ripe for disposition.[1]

## I.      BACKGROUND

Plaintiff Alison McKinnon served as the Senior Human Resources Director at L-3

Communications Cincinnati Electronics Corp. ("L-3 Cincinnati") from February 2012, until she

was terminated on February 23, 2016. She contends that she was terminated because she "did

not conform to gendered stereotypes about women, she stood up for women in leadership

positions, advocated for change and complained about the discriminatory, retaliatory and

unethical business practices within Defendants [L-3 Cincinnati] and L-3 Communications Corp."

---

[1] Plaintiff's recent Motion for Leave to File Surreply (Doc. 47) is **DENIED**. In the proffered surreply, Plaintiff seeks to use evidence from Jim Worsham's deposition, which was conducted by agreement after the discovery cutoff to accommodate Mr. Worsham's medical needs. The Parties independently agreed that "Mr. Worsham will not support any dispositive motion by way of an Affidavit or statement." (Doc. 48-2, PageID 1896). While Plaintiff could argue that the agreed prohibition only applies to Defendants, the Court still denies the Motion (Doc. 47) due to concerns about derailing the case schedule with another round of briefing at this late juncture.

(Doc. 36, PageID 1596). In April of 2016, she filed the instant lawsuit alleging: (1) gender discrimination in violation of Ohio Rev. Code 4112; (2) gender retaliation in violation of Ohio Rev. Code 4112; (3) FLSA retaliation; (4) False Claims Act retaliation; (5) whistleblower retaliation in violation of Ohio Rev. Code Chapter 4113.52(b); and (6) retaliation in violation of public policy. In opposition to Defendants' Motion for Summary Judgment, Plaintiff "does not oppose Defendants' motion insofar as it seeks summary judgment on Plaintiff's claim brought under the Ohio Whistleblower Act." (Doc. 36, PageID 1596). Therefore, the Court enters summary judgment in favor Defendants on Count V.

This Order addresses the merits of the remaining claims.

A. Timeline

In 2012, Plaintiff Alison McKinnon and her husband relocated to Cincinnati from Colorado, so that Plaintiff could accept a position with L-3 Cincinnati as the Senior Human Resources Director. At least two people were involved in the decision to hire Plaintiff: (1) Russ Walker, and (2) Andrea Krych Connolly. (Doc. 32, PageID 1479); (Doc. 23, PageID 487-88). Walker was the President of L-3 Cincinnati, and Connolly was the then-Vice President of Human Resources. (Doc. 32, PageID 1479).

As the Senior Human Resources Director, Plaintiff reported to Walker. (Doc. 23, PageID 500). Plaintiff was responsible for leading HR functions, ensuring compliance, and providing advice and guidance to Walker and other members of leadership. (*Id*. at 471-72). The record evidence before the Court also shows that Plaintiff was involved in collective bargaining and personnel development. (Doc. 23, PageID 498).

1. The Events of 2012-2013

In 2012 and 2013, Plaintiff received largely favorable performance evaluations from Walker.  In reviewing Plaintiff's 2013 performance, Walker noted that "Alison continues in 2014 to be one of my most important assets in the [Senior Leadership Team]….Alison has been and continues to be a powerful force in the area of talent acquisition and development and in pushing CE to mature and grow into a high performance team. She is an Excellent HR leader and an Excellent partner for me in achieving the changes needed to keep CE growing and thriving during difficult times." (Doc. 22-1, PageID 298).

Despite overall positive reviews from Walker, certain employee complaints in 2013 led Defendants to investigate Plaintiff for an allegedly "harassing and bullying management style." (Doc. 28, PageID 1425-25).  Indeed, multiple employee complaints were investigated in 2013 and 2014.  (*Id*.)  Plaintiff began working with an executive coach to improve the "inner workings" of the HR team.  *(Id*.)

The year 2013 is also of some significance because, in 2013, Connolly (the HR VP who participated in Plaintiff's hiring) began an FLSA reclassification project that would later be completed by Plaintiff.  The purpose of the project was to determine whether employees had been properly classified as either FLSA exempt or FLSA non-exempt – which impacts their entitlement to overtime pay – and that any misclassifications would be remedied in accordance with federal law.  (Doc. 32, PageID 1490).  Defendants hired a consultant to help with this process, and at some point in 2013 or the first half of 2014 the consultant provided Connolly with a list of individuals who were potentially misclassified.  (Doc. 32, PageID 1491).  From there, HR professionals who worked under Connolly took a closer look at those individuals

identified by the consultant, and thereafter their findings were vetted by Legal. (*Id*.). In 2013, Plaintiff was on the project team led by Connolly.

    1.  The Events of 2014

In Plaintiff's 2014 performance evaluation, Walker gave Plaintiff an overall "positive" review but noted, for example, that Plaintiff still needed work developing "political techniques" for dealing with frustrating situations. (Doc. 22-1, PageID 298).

In 2014, the FLSA reclassification project was still in progress. At some point prior to July 2014, Connolly's team identified a woman named Kim Neil as potentially misclassified. (Doc. 32, PageID 1491). Neil was the secretary of the then-CFO, Lou Park. (*Id*.) There is documentation from June 17, 2014 showing that, at a minimum, Park was resistant to having his secretary reclassified. (Doc. 32-1, PageID 1537) (email from Park to Connolly stating "[t]hat works as long as Kim stays exempt."). Not long after the foregoing email exchange with Park, Connolly lodged an internal complaint about the allegedly sexist behavior of a recently-promoted VP toward Connolly and members of her team. The day after that investigation closed, Connolly was notified that her position was being eliminated. (Doc. 32, PageID 1488).

The Parties disagree over the legal significance of Connolly's termination to Plaintiff's claims, but the Court still notes the above sequence of events because Connolly departed before the FLSA reclassification project concluded. Jim Worhsam was responsible for completing the project. (Doc. 22, PageID 132). In December 2014, Plaintiff raised the issue of the FLSA reclassification project during a Sector HR telephone call with Lou Park (CFO), Jeff Miller (President Integrated Sensing Systems Sector ("ISS")), Roman Turchyn (Vice President of HR for Wescam), and other HR representatives. (*Id.* at 133-34). Plaintiff advised them of her understanding that the misclassified employees should be paid by end of year. (*Id*.). Plaintiff

4

claims, and at least one witness employed by Defendants does not dispute, that Plaintiff and Jeff

Miller clashed over Plaintiff raising the FLSA reclassification project on the December 2014

call. (Doc. 23, PageID 631) ("I think that her and Jeff had some words on that."). According to

Plaintiff, Miller accused Plaintiff of irresponsibly raising a "$500,000 liability" late in the year,

suggesting that Plaintiff alone had knowledge of the project and neglected her duties by failing to

raise the issue earlier in the year. (Doc. 22, PageID 133-34). Walker tacitly concedes that that

the clash occurred, by suggesting that the severity of the incident could have been avoided if

"Lou [Park] stood up and told him that that was an active project that was going on," instead of

remaining silent and essentially allowing Miller to believe that Plaintiff had been dilatory. (Doc.

23, PageID 631). In addition to the December 2014 telephone conference, Miller recalls separate

communications with Plaintiff during which Plaintiff said that "Mr.Park had been . . . impeding

an investigation or withholding data or doing something to not let a case move forward that she

believed was important." (Doc. 26, PageID 1287). According to Miller, he investigated

Plaintiff's claims regarding Lou Park and found them to be unsubstantiated. (*Id*.) Ultimately,

Miller thought Plaintiff exhibited "inappropriate behavior." (*Id*. at 1293). According to Miller,

Plaintiff was "very emotional" rather than data-driven. (Doc. 26, PageID 1295) (using as an

example Plaintiff's desire for a "training program," and describing her campaign as an

"emotional response" rather than a "data response").[2]

    Defendants claim that Larry Wasnock had a "similar experience" with Ms. McKinnon in

2014. When Wasnock asked Plaintiff to help gather information regarding a former employee's

discrimination claim, Plaintiff allegedly lectured Wasnock in an "unnecessarily adversarial"

tone. (Doc. 28, PageID 1427). Around the same time, Plaintiff's executive coach noted that

---

[2] In her papers, Plaintiff argues at various points that she was verbally attacked for establishing a women's leadership program, but it is unclear from the record when the establishment/alleged verbal attacks occurred.

Plaintiff "continues to have challenges with leading her team" and she needed to "continue to work on her peer relationships." (Doc. 22-2, PageID 350). Walker's 2014 evaluation of Plaintiff reflected similar concerns. (Doc. 22-1, PageID 313).

2. The Events of 2015

After the clash between Plaintiff and Miller, Miller and Park both claim they shared their concerns regarding Plaintiff with Walker. (Doc. 26, PageID 1292-96) (Doc. 27, PageID 1371). Plaintiff claims that, in 2015, Park, Miller, Turchyn, and others began undermining her. For example, Plaintiff claims she heard Turchyn ask one of Plaintiff's HR staff members "how she felt about working for [Plaintiff] given that [Plaintiff] had multiple ethics complaints filed against [Plaintiff] and [Plaintiff] was a difficult boss to work for." (Doc. 22-3, PageID 372). Plaintiff was upset about the comment, and asked her executive coach to review a statement she prepared to read to Worsham (the HR VP) regarding the incident, which she read to him over the telephone on May 27, 2015. (Doc. 22, PageID 161-62) (Doc. 22-3, PageID 372). The written statement includes no mention of gender or sex discrimination, but Plaintiff suggests in her opposition brief that the May 2015 telephone call expressly included mention of gender or sex discrimination. (Doc. 36, PageID 1627). To support her claim, Plaintiff points to a July 12, 2015 email that purportedly memorializes the May 27 telephone call. (Doc. 22-3, PageID 387).[3] However, Plaintiff's affidavit lacks any such claim, instead stating that she complained of "harassment" in May 2015 (without mention of sex or gender). (Doc. 36-2, PageID 1674). Defendants suggest that the July 12, 2015 email includes mention of gender discrimination to manufacture a retaliation claim, because (as further discussed below) on July 10, 2015 Plaintiff had been warned that her termination was imminent.

---

[3] Defendants note that the lack of temporal proximity between the May 2015 call and July 2015 email undercuts any claim that the email indeed "memorializes" the call, or confirms that gender discrimination was discussed.

Walker, Plaintiff's direct supervisor, claims that he made the decision to terminate (or was at least contemplating terminating) Plaintiff's employment as of July 2015. He explains that he had been told by Steve Kanter, who was two levels above Walker, that Walker's HR Department "had a problem." Walker claims that he perceived the criticism as directed toward Plaintiff's lack of leadership skills. (Doc. 23, PageID 497). Kanter's comment was made on July 9, 2018. (Doc. 22-2, PageID 333). On July 10, 2018, Walker told Plaintiff to start looking for another job. (*Id.*; Doc. 22, PageID 171).[4] On July 13, 2018, Plaintiff contacted the company's outside counsel, seeking recommendations for employment lawyers. (Doc. 36-2, PageID 1676).

After Walker told Plaintiff to start looking for another job, Plaintiff undertook the following actions: (A) on July 12, 2015, Plaintiff initiated a formal complaint against an HR peer, Roman Turchyn, for harassment (Doc. 22-3, PageID 387); (B) in September 2015, Plaintiff declined to sign off on an invoice from Wescam, citing concerns about compliance with the False Claims Act (FCA); and (C) in November 2015, Plaintiff filed an ethics complaint against Miller and Park, pertaining to alleged retaliation (Doc. 22-4, PageID 407). Walker asserts that he could not execute his plans to terminate Plaintiff until early 2016, because company policy dictated that an employee could not be terminated during the pendency of an ethics investigation; he believes that the investigations delayed her termination. (Doc. 23, PageID 521-22).

a. Internal Harassment Complaint against Turchyn

This internal complaint alleging gender discrimination appears to be premised on the above-referenced comments Turchyn made to Plaintiff's staff member. Although Plaintiff read a statement regarding Turchyn's conduct to Worsham in May 2015, Plaintiff ultimately lodged a formal, written complaint on July 12, 2015— two days after Walker told Plaintiff to start looking

---

[4] Plaintiff does not dispute that she was given such a directive. (Doc. 22, PageID 171) (Doc. 22-2, PageID 333).

for another job.  (Doc. 22-3, PageID 388).  Carmen Pombeiro was assigned to undertake an investigation of the internal complaint.  After conducting numerous interviews, Pombeiro found "no evidence of gender discrimination," and instead concluded that Plaintiff was perceived by others as "brusk [sic] . . .combative . . . negative  . . . difficult."  (Doc. 24-1, PageID 1091).  Pombeiro's report was dated October 15, 2015.  (*Id.*)

### b.  FCA Issue

In October 2015, Plaintiff declined a request that she sign a "representations and certifications statement" because she believed Wescam was overcharging for recruiting services.  (Doc. 22-4, PageID 404-05).  Plaintiff claims that she was concerned that the charges, which would ultimately be passed to the government, could violate the False Claims Act.

### c.  Internal Retaliation Complaint

In November 2015, Plaintiff filed an internal ethics complaint, claiming Mr. Miller and Mr. Park retaliated against her for "carrying out" the FLSA project, requesting recruiting invoices, and refusing to sign off on Wescam's invoices. (Doc. 22-4, PageID 407).

### 3.  Events of 2016

In January 2016, after all investigations of Plaintiff's internal complaints had been completed, Worsham offered her a severance package.  (Doc. 22, PageID 210-11).  Plaintiff declined the package.  Her employment was ultimately terminated on February 23, 2016.  Bernard Bena assumed Plaintiff's role immediately after Plaintiff; Amy Padgett later took over.  (Doc. 23, PageID 474, 479).

### 4.  Factual Disputes

The Parties disagree over the reasons for Plaintiff's termination.  Defendants claim she was fired due to poor performance and an inability to build relationships with others.  (Doc. 36-

1, PageID 1653).  Plaintiff claims, however, that she was actually fired for not demonstrating characteristics stereotypically associated with women.  She claims that men were promoted for being assertive, while she was punished for demonstrating the same qualities.

The Parties also dispute the timing of when the decision to terminate Plaintiff was made.  In their Motion, Defendants claim that the decision was made or at least contemplated in July 2015.  (Doc. 28, PageID 1429).  Walker told Plaintiff as early as July 10, 2015 to "start looking for another job."  (Doc. 22, PageID 171); (Doc. 22-2, PageID 333).  Plaintiff agrees that this conversation occurred, (*id.*), but claims that no official decision was made until much later.

Additionally, the Parties dispute who ultimately replaced Plaintiff.  Defendants claim that they replaced Plaintiff with a woman, (Doc. 23, PageID 479), while Plaintiff observes that she was initially replaced with Bernard Bena, a man.  In their reply, Defendants claim – without citations to the record – that Bena was only a temporary replacement.

Below, the Court will address the extent to which the above-referenced factual disputes create genuine disputes of material fact.

## II.     ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

A. Gender Discrimination

Plaintiff brings her gender discrimination claim under Ohio Rev. Code § 4112. According to the Ohio Supreme Court, federal caselaw interpreting Title VII is generally applicable to discrimination claims brought under Ohio law. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Com.*, 66 Ohio St. 2d 192, 421 N.E.2d 128 (1981)). Indeed, all Parties rely on federal opinions in their briefing.

A discrimination claim can be proven by direct or circumstantial evidence of discrimination. *Hale v. Mercy Health Partners*, 20 F. Supp. 3d 620, 635 (S.D. Ohio 2014). As

Plaintiff has not presented direct evidence of gender discrimination, her claim is subject to the *McDonnell Douglas* burden-shifting framework.

Plaintiff bears the burden to show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier v. United States,* 388 F.3d 984, 987 (6th Cir. 2004). Notably, a district court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Wexler v. White's Fine Furniture,* 317 F.3d 564, 574 (6th Cir.2003). If the plaintiff meets this initial burden of establishing a *prima facie* case, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If in turn the defendant provides a legitimate reason, the burden reverts to the plaintiff to show that the defendant's alleged reason is a mere pretext for discrimination. *Novotny v. Elsevier*, 291 F. Appx. 698, 702 (6th Cir. 2008).

a. *Prima Facie* Discrimination

Defendants do not appear to dispute the first three elements, and instead focus on whether Plaintiff has borne her burden regarding the fourth element, *i.e.,* that she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. Plaintiff claims that she was replaced by a man, Bernard Bena. In their reply, Defendants disagree and assert that Bena did indeed assume Plaintiff's position originally, but only on a temporary basis. (Doc. 44, PageID 1734). According to Defendants, Bena's purportedly temporary occupancy of Plaintiff's former role cannot be used to help Plaintiff meet her burden on the fourth element: "[I]f another existing employee temporarily takes on the plaintiff's responsibilities . . .

until the company eventually hires someone else to fill the vacant position, 'replacement' occurs when the new person is hired." *Laws v. HealthSouth N. Kentucky Rehab. Hosp. Ltd. P'ship*, 828 F. Supp. 2d 889, 909 (E.D. Ky. 2011), *aff'd*, 508 F. App'x 404 (6th Cir. 2012). *Accord*: *Shazor v. Professional Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014).

Of note in Defendants' argument is that they do not deny that Bena assumed Plaintiff's position immediately after Plaintiff. Instead, Defendants argue that Bena was a temporary replacement, without citation to the record. However, Plaintiff points to Carmen Pombeiro's September 10, 2015 interview notes, in which Pombeiro attributes the following statement to Roman Turchyn: "Lou mentioned looking to replace [Alison McKinnon]. Should consider Bernie Bena. We're considering BB but not sure it's gonna fly. [Roman Turchyn] to do the search when ready . . . when she's fired." (Doc. 24-1, PageID 1055).[5] Plaintiff argues that this evidence tends to support that Bena was pre-selected to replace Plaintiff and did indeed replace Plaintiff. (Doc. 36, PageID 1609). Construing the facts before the Court in favor of Plaintiff, a reasonable jury could deem Bena the actual replacement, with Defendants recruiting a woman only after assessing whether the decision would "fly" in light of the status of actual or anticipated

---

[5]In their reply, Defendants offer no argument *contra* the admissibility of Turchyn's specific statements to Carmen Pombeiro. However, there is a general objection that Pombeiro's notes constitute inadmissible hearsay, and thus cannot be offered to prove the truth of the matter asserted.

Defendants' general objection fails to persuade this Court that the notes are hearsay at all, let alone inadmissible hearsay. Fed. R. Evid. 801(d)(2)(D); *Dittmar v. Ethyl Corp.*, 825 F.2d 410 (6th Cir. 1987) ("Moreover, the noted statements, reflecting what Ethyl officials had said, may be viewed as vicarious admissions of Ethyl under Fed. R. Evid. 801(d)(2)."); *Marwaha v. SBC Glob. Servs.*, No. 05-cv-2015, 2006 U.S. Dist. LEXIS 72977, at *22 (N.D. Ohio Oct. 6, 2006) ("The interviewer had authority to conduct the interview and each interviewee was asked questions and provided rankings appropriate to their relationship (peer, direct report, boss) with Marwaha."). Even if Rule 801(d)(2)(D) were somehow unavailable to address the embedded statements (*i.e.*, Park's statement as paraphrased by Turchyn, and Turchyn's statements to Pombeiro), there is still precedent to admit at least the statements of Turchyn not for their truth but to show the state of mind of the declarant. *Dittmar v. Ethyl Corp.*, 825 F.2d 410 (6th Cir. 1987). In other words, the Court is not concerned with the truth of whether Bena "should" have been considered or whether his selection would indeed "fly"; instead, the fact that Bena was being mentioned in such terms at all prior to Plaintiff's termination arguably places into question whether he was intended to be "temporary."

litigation. Ultimately, whether Bena was actually hired for Plaintiff's role on a "temporary" basis is unclear based on the record before the Court. What is clear is that Bena, a man, served in Plaintiff's role immediately after Plaintiff. The Court finds that Plaintiff has made a *prima facia* case of gender discrimination.

### b. Legitimate, Nondiscriminatory Reason

Defendants assert that Plaintiff's performance was subpar. The "complete" reason for her termination – as stated in Defendants' interrogatories – was "poor management style, leadership, communications; incompatibility and poor relationships with other employees." (Doc. 36-1, PageID 1653). Defendants have offered a "legitimate, non-discriminatory reason."

### c. Pretext

To determine whether Defendants' nondiscriminatory reasons are pretextual, the Court looks to whether the Defendants' "proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wilson v. Cleveland Clinic Found.*, 579 F. App'x 392, 398 (6th Cir. 2014) "Ordinarily, to establish the insufficiency of the proffered reasons, the plaintiff must show that 'other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated' [its] actions towards the plaintiff." *Bonner v. Scope Servs.*, No. 1:12-cv-32, 2015 U.S. Dist. LEXIS 94748, at *19 (S.D. Ohio July 21, 2015) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Defendants claim that "Ms. McKinnon has no evidence of any male (or female, for that matter) with similar job responsibilities who failed in these respects, but was not discharged." (Doc. 28, PageID 1433).

Plaintiff attempts to condense her proffered comparator evidence (with bates citations to various performance reviews) into a single chart sponsored by Plaintiff's counsel. Defendants argue that the comparator evidence should be rejected for two reasons: (1) attorney affidavits used to introduce evidence are rarely admissible, since most attorneys come by their knowledge of exhibits through working with other parties, and not through 'personal knowledge', as Civil Rule 56(c)(4) requires;[6] and (2) "Ms. McKinnon has made no attempt to establish that her alleged comparators had job duties sufficiently similar to her such that they could be considered a legal comparator." (Doc. 44, PageID 1735) (citing *Dixon v. Univ. of Toledo*, 702 F.3d 269, 279 (6th Cir. 2012) ("[W]e must at the very least have before us a description of the duties inherent in Bresnahan's role at the University. Without such evidence, we cannot engage in an accurate comparison of the two individuals for the purposes of summary judgment."). On the latter point, Plaintiff contends that she need not demonstrate an exact correlation with the individuals she has identified as receiving more favorable treatment in order for them to be considered "similarly situated." *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005). Rather, Plaintiff and the employees with whom she seeks to compare herself must be similar in "all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 353 (6th Cir.1998) (noting that inflexible criteria for establishing the similarly-situated requirement would mean that "a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a *prima facie* case (absent direct evidence of discrimination)"). Similarly, although the comparison need not involve identical conduct, the conduct must be of comparable seriousness. *Bobo v. UPS*, 665 F.3d 741, 751 (6th Cir. 2012).

---

[6] (Doc. 44, PageID 1733) (citing *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 666 (6th Cir. 2005)).

To avoid any risk of relying on unauthenticated evidence or evidence that runs afoul of Fed. R. Civ. P. 56(c)(4), the Court will disregard the chart sponsored by Plaintiff's counsel. (Doc. 36-1).  However, the Walker deposition provides sufficient evidence that at least one similarly situated male was not fired, despite significant problems with communication and peer relationships.

For example:  Plaintiff was a director who reported to Walker; Kevin Haurin is a director who reports to Walker.  (Doc. 23, PageID 534).  Plaintiff directed Human Resources; Haurin directs Quality.  (*Id*.)  Plaintiff was required to manage a staff; Haurin is required to manage a staff.  (*Id*. at 534).  HR requires skills in the area of communication, leadership, and relationship-building; Quality requires the same, as demonstrated by Walker's admission that he assigned a coach to assist Haurin with those skills.  (*Id*. at 535) (describing Haurin as having problems with interpersonal skills, communication, and relationships).  Walker said Plaintiff lacked "political" communication skills (Doc. 22-1, PageID 298); Walker said Haurin was "socially awkward." (Doc. 23, PageID 535).  Defendants claim that Plaintiff demonstrated poor management style, leadership, and communications, and lacked compatibility and relationships with other employees (Doc. 36-1); Walker describes Haurin as lacking "interpersonal skills" and failing to meet and communicate well with his team. (Doc. 23, PageID 535).  Plaintiff was assigned an executive coach to work on her skills; Haurin was assigned the same coach.  (*Id*. at 535-36). Despite coaching, Haurin has "backslid" in his progress.  (*Id*. at 535).  Haurin remains with company, while Plaintiff was terminated.  The Court has before it sufficient evidence to conclude that the two directors are similar in the relevant aspects, especially given that Walker concedes that Plaintiff was not terminated for any HR-specific technical deficiency (e.g., collective bargaining, personnel development, etc.) (*Id*. at 498).  Furthermore, the perceived deficiencies of

the two directors are sufficiently similar, which is at least partially evidenced by Walker's testimony regarding their performance deficiencies and the fact that both Plaintiff and Haurin were assigned the same executive coach to work on those deficiencies.  (*Id.* at 535-36).  There is no "exact correlation" between the two, but an exact correlation is not necessary.  *Ercegovich,* 154 F.3d at 353. Ultimately, Plaintiff's evidence of pretext is sufficient to survive summary judgment, in light of her comparator's title, direct report (Walker), staff management requirements, required skillset (management, communication, leadership), and performance deficiencies, as observed by Walker.

### d.  Same Actor Inference

Before moving on to Plaintiff's remaining claims, the Court will address Defendants' assertion that the same-actor inference militates against a finding of pretext.  In short, "[t]he same-actor inference 'allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee.'" *Mencarelli v. Alfred Williams & Co.*, 656 F. App'x 80, 87 (6th Cir. 2016) (quoting *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995)).  This principle is grounded in the fact that "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Buhrmaster*, 61 F.3d at 464.

Plaintiff counters that the Sixth Circuit has eschewed a mechanical application of the same-actor inference:

> We therefore reject the idea that a mandatory inference must be applied in favor of a summary-judgment movant whenever the claimant has been hired and fired by the same individual. Such an approach strikes us as being contrary to the Supreme Court's opinion in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations,

> the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Although the factfinder is permitted to draw this inference, it is by no means a mandatory one, and it may be weakened by other evidence. *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 464 (6th Cir.1995) (describing how the length of time between hiring and firing an employee may weaken the same-actor inference). We therefore specifically hold that where, as in this case, the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact.

*Wexler*, 317 F.3dat 573–74.

Here, application of the same-actor inference is not warranted. Walker was the ultimate decision-maker in Plaintiff's hiring and firing, but before her termination others approached Walker with purported concerns regarding Plaintiff's performance. (*See, e.g.*, Doc. 26, PageID 1292-96; Doc. 27, PageID 1379). Their potential influence on the ultimate decision-maker should not be ignored: "courts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee." *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995). Thus, the same-actor influence does not bar the Court's above finding regarding pretext.

### B. Gender Retaliation

The burden falls on Plaintiff to establish a prima facie case of retaliation. A prima facie case of retaliation is established when the plaintiff shows that "(1) he ... engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins.*

*Co.*, 529 F.3d 714, 720 (6th Cir. 2008). Specifically, "but for" causation between the protected activity and the adverse employment action is needed. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). "But for" causation exists where "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

With retaliation, the question is not whether the conduct being reported constituted actionable discrimination, but rather whether the employee reasonably and in good faith believed that she was reporting such conduct. *Braun v. Ultimate Jetcharters, Inc.*, No. 5:12CV1635, 2014 U.S. Dist. LEXIS 103972, at *15-16 (N.D. Ohio July 30, 2014) (citing *McBroom v. Barnes & Noble Booksellers, Inc.*, 747 F. Supp. 2d 906, 914 (N.D. Ohio 2010)). However, employers "need not suspend previously planned [adverse action] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 1511 (2001).

Here, Defendants argue that Walker was contemplating Plaintiff's termination as early as July 2015. He told her start looking for a new job on July 10, 2015, a point which Plaintiff does not dispute. (Doc. 22, PageID 171). Plaintiff's first internal complaint referencing "gender discrimination" occurred days later, on July 12, 2015. While Plaintiff argues that she verbally complained of gender discrimination as early as May 2015, she supports this factual proposition with her affidavit (Doc. 36-2), which makes only a general reference to complaining of Turchyn's "harassment" in May 2015. But, only harassment or discrimination that is based upon a protected characteristic, not general harassment, is illegal under Title VII/Ohio Rev. Code §4112. *McDaniel v. Ohio Dep't of Rehab. & Correction*, No. 2:14-CV-0122, 2015 WL

7888759, at *8 (S.D. Ohio Dec. 4, 2015).  Absent evidence that Plaintiff complained of gender-based harassment prior to July 10, 2015, when Walker advised Plaintiff to start looking for another job, Plaintiff's "but for" causation evidence is insufficient.  *See Breeden*, 532 U.S. at 272.[7]  Accordingly, the Court enters judgment in favor of Defendants on the gender retaliation claim.

### C.  FLSA Retaliation

To make a prima facie case of retaliation, a plaintiff must prove that "(1) she engaged in protected activity under the FLSA; (2) her exercise of this right was known by the employer; (3) the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action."  *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530 (6th Cir. 2011).

The Parties disagree over whether Plaintiff – who completed the FLSA reclassification project as part of her job duties – engaged in activity protected under the FLSA.  "The FLSA was created to protect an employee who 'lodge[s] complaints or suppl[ies] information to officials regarding allegedly substandard employment practices and conditions.'"  *Pettit v. Steppingstone Ctr. for the Potentially Gifted*, No. 08-12205, 2009 U.S. Dist. LEXIS 78262, at *26-27 (E.D.

---

[7] Plaintiff appears to suggest that, by not following through with the termination until February 2016, Defendants engaged in conduct that places causality into question.  (Doc. 36, PageID 16329-30).  Based on the record, the Court cannot agree.  Defendants have asserted that, pursuant to company policy, an employee cannot be terminated during the pendency of open investigation.  Plaintiff offers no contrary evidence.  After Walker told Plaintiff to start looking for another job, Plaintiff initiated multiple formal grievances, in succession, that required investigation.  After the close of the final investigation, Plaintiff was terminated.  In a case like this, where the warning of imminent termination is clear and uncontested, the Court finds that Plaintiff has marshaled insufficient proof of causality, under the standard articulated in *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 507 (6th Cir. 2014).  A contrary conclusion arguably incentivizes employees "who see the proverbial writing on the wall . . . to use [Title VII/Ohio Rev. Code 4112] protections to insulate themselves from adverse employment actions that were previously contemplated."  *Id.*  To be clear, Plaintiff has marshaled sufficient proof that the adverse action contemplated as of July 10, 2015 might have been triggered by discrimination.  But, the "retaliation proof" Plaintiff marshals is self-created after July 10, 2015, when the proverbial writing became clear.

Mich. Sep. 1, 2009) (citing *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99 (1st Cir. 2004)). However:

> Under FLSA retaliation law, there is a legally cognizable distinction between the performance of job duties and the assertion of one's own FLSA rights or the rights of others. For an employee specifically tasked with personnel or human resources duties, dealing with FLSA compliance is part of the job, to be undertaken with the interests of the employing company in mind. An assertion of FLSA rights, on the other hand, will normally be specific to one or more employee(s) or a class of employees and will usually be made in the interests of that employee, group or class of employees and, thus, may be adverse to the employer's interests.

*Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530-31 (6th Cir. 2011). In other words, where "FLSA complaints [are] made in the course of performance of human resource job duties assigned to [a plaintiff] and undertaken for the purpose of protecting the interests of the employer, they do not constitute protected activity under § 215(a)(3)." *Id.* at 530. However, it is not impossible for an HR employee to engage in activity protected under the FLSA. At least one district court has explained that, "[i]n order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA." *Robinson v. Walmart Stores, Inc*., 341 F. Supp. 2d 759 (W.D. Mich. 2004).

In *Pettit,* an HR employee's FLSA retaliation claim at least partially survived summary judgment because the plaintiff there threatened to report her employer to the United States Department of Labor if it did not remedy its FLSA misclassifications—therefore, the *Pettit* plaintiff had stepped beyond performing her expected duties. 429 F. App'x at 531. Plaintiff

attempts to align herself with the plaintiff in *Pettit*, based on two separate theories: (1) she was terminated because "she would not assent to [Park and Miller's] insistence that Neil continue to be misclassified"; and (2) she was terminated because she filed an internal, written ethics complaint regarding perceived FLSA retaliation in November 2015. (Doc. 36, PageID 1638).

The Court will begin with the latter argument. Given the overall timeline in this case, Plaintiff filed her internal ethics complaint regarding perceived FLSA retaliation relatively late in the process—November 2015. Even if the Court assumes that lodging a written grievance complaining of perceived FLSA retaliation constitutes protected activity, the timing of the written complaint negates a causation finding because the termination was being contemplated as of July 2015. As discussed above, the record evidence shows that – as of July 10, 2015 – Plaintiff's supervisor told Plaintiff to start looking for another job. (Doc. 22-2, PageID 333). In sum, the Court will not rule as a matter of law regarding the protected nature of the written grievance, because the timing of the grievance negates causal connection. *See Breeden*, 532 U.S. at 272. *See also* n. 7, *supra*.

Next, the Court looks to whether Plaintiff pressing forward with the FLSA reclassification project constitutes a protected activity. Timing-wise, she raised the FLSA reclassification project in December 2014. In other words, these events occurred well before Walker started to contemplate her termination in July 2015. Given Plaintiff's compliance-related duties, the Court construes her completion of the project as falling within the scope of the duties she owed the company. However, the real question is whether her "insistence" regarding Ms. Neil's misclassification takes her beyond those duties. *Robinson,* 341 F. Supp. 2d at 759 *(* "the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting

FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.").

The Court has studied Plaintiff's deposition and the exhibits she cites to support the proposition that she stepped beyond her duties as Senior HR Director, or was at least perceived by Defendants' leadership as doing so. Construing all inferences in favor of Plaintiff, it appears that at all times Plaintiff at least represented to leadership that she was pressing the FLSA reclassification issue because the *company's* liability. (Doc. 22, PageID 135). At no point did Plaintiff threaten to lodge a complaint with the Department of Labor, or help Ms. Neil or other misclassified employees pursue their FLSA rights. Thus, under the standard articulated in *Pettit*, the Court finds as a matter of law that Plaintiff did not engage in activity protected under the FLSA, and thus the Court enters judgment in favor of Defendants on the FLSA retaliation claim.

### D. FCA Retaliation

In the absence of direct evidence of retaliatory motive, "[t]he familiar *McDonnell-Douglas* burden-shifting framework applies to [FCA] retaliation claims." *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). To establish a prima facie case, a plaintiff must prove that she engaged in a protected activity; her employer knew she engaged in protected activity; and the employer discharged or otherwise discriminated against her as a result of the protected activity. *Id.* "If a plaintiff establishes a prima facie case of retaliation, the defendant may rebut the presumption of retaliation by asserting a legitimate, non-[retaliatory] reason for its actions. The plaintiff must then show by a preponderance of the evidence that the employer's proffered reason for the employment action is pretextual." *Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005) (citations omitted), *abrogated on other grounds by Fox v. Vice*, 563 U.S. 826, 131 S. Ct. 2205, 180 L. Ed. 2d 45 (2011).

Plaintiff claims that her failure in October 2015 to sign off on certain expenses due to FCA compliance concerns, and her November 2015 internal ethics complaint alleging retaliation for the same, each constitute activities protected under the FCA. Even if the Court assumes *arguendo* that such conduct was protected under the FCA, as discussed above, the activities occurred after Plaintiff was warned that termination was imminent. *See Breeden*, 532 U.S. at 272. *See also* n. 7, *supra*. Accordingly, the Court enters judgment in favor of Defendants on the FCA retaliation claim.

### E. Retaliation in Violation of Public Policy

"The elements of a claim for wrongful discharge in violation of public policy are: (1). That clear public policy existed and was manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the clarity element); (2). That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3). The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); (4). The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)." *O'Connor v. Nationwide Children's Hosp.*, 219 F. Supp. 3d 673, 677 (S.D. Ohio 2016).

Plaintiff claims that Defendants retaliated against her for retaining an attorney. Ohio courts recognize a strong public policy in favor of employees consulting an attorney about their legal rights, and which prohibit an employer from terminating an employee in retaliation for consulting a lawyer. *Chapman v. Adia Servs., Inc.*, 116 Ohio App. 3d 534, 544, 688 N.E.2d 604, 610 (1997) ("Therefore, we hold that it is repugnant to the public policy of this state for employers to terminate employees for exercising their right to consult a lawyer. The courthouse door must be open to the people of Ohio, and it is not ajar when citizens may be fired for

entering."); *Boyd v. Winton Hills Med. & Health Ctr., Inc.,* 133 Ohio App.3d 150, 727 N.E.2d 137, 143 (1999) ("Ohio's public policy prohibits an employee from being fired solely for consulting an attorney.").

To support that Defendants knew of Plaintiff's intention to retain an attorney, Plaintiff cites to a July 13, 2015 email she sent to Defendants' outside counsel (who is also counsel of record in this case). (Doc. 36-2). Specifically, Plaintiff emailed outside counsel asking for names of plaintiffs' lawyers, and in response outside counsel gave her three names. (*Id.*) Plaintiff suggests that this email put Defendants on notice that she intended to seek counsel, and triggered their retaliation; however, Defendants persuasively argue that the email at issue is devoid of any information alerting outside counsel that the Plaintiff was seeking recommendations on behalf of *herself*. Still, construing the email and other purported communications in Plaintiff's favor, and assuming *arguendo* that Defendants' leadership knew as of July 13, 2015 that Plaintiff was seeking counsel, such facts fail to establish causality. Again, Walker advised Plaintiff on July 10, 2015 to start looking for another job. The email exchange between Plaintiff and outside counsel occurred afterward. It is not unusual for an employee to seek counsel after such a conversation, which is why a plaintiff cannot create an Ohio public policy claim by retaining a lawyer *after* being informed of an adverse employment decision, or that such a decision is imminent. Under the facts of this case, Plaintiff's proof regarding causal connection is insufficient. *See Breeden*, 532 U.S. at 272. *See also* n. 7, *supra.* Defendants are entitled to judgment in their favor on the public policy claim.

## III.    CONCLUSION

Therefore, consistent with the above:

(1) Defendants' Motion for Summary Judgment (Doc. 28) is **GRANTED IN PART** and **DENIED IN PART**, with the Court entering judgment in favor of Defendants on all claims, with the exception of Count I (gender discrimination); and

(2)  Plaintiff's Motion for Leave to File Surreply (Doc. 47) is **DENIED**.

**IT IS SO ORDERED.**

  *s/ Michael R. Barrett*
**UNITED STATES DISTRICT JUDGE**